Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/15/2020 08:09 AM CDT

State of Nebraska, appellee, v.
Amy J. Krannawitter, appellant.

___ N.W.2d ___

Filed February 21, 2020.    No. S-19-014.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions for New Trial: Appeal and Error.** The standard of review for the denial of a motion for new trial is whether the trial court abused its discretion in denying the motion.

3. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection.

4. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Words and Phrases.** The second category of police-citizen encounters, the investigatory stop, is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. This type of encounter is considered a seizure sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.

5. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Arrests: Search and Seizure: Probable Cause.** The third type of

police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

6. **Constitutional Law: Search and Seizure.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

7. \_\_\_\_: \_\_\_\_. In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled.

8. **Motions for New Trial: Evidence: Proof.** In order to obtain a new trial based on newly discovered evidence, a defendant must show that the new evidence could not with reasonable diligence have been discovered and produced at trial and that the evidence is so substantial that a different result may have occurred.

9. **Blood, Breath, and Urine Tests: Drunk Driving: Evidence: Proof.** The four foundational elements which the State must establish as a foundation for the admissibility of a breath test in a driving under the influence prosecution are as follows: (1) that the testing device was working properly at the time of the testing, (2) that the person administering the test was qualified and held a valid permit, (3) that the test was properly conducted under the methods stated by the Department of Health and Human Services, and (4) that all other statutes were satisfied.

Appeal from the District Court for Lancaster County: Andrew R. Jacobsen, Judge. Affirmed.

Brad Roth and Kenneth Yoho, Senior Certified Law Student, of McHenry, Haszard, Roth, Hupp, Burkholder & Blomenberg, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

HEAVICAN, C.J.

## I. INTRODUCTION

Amy J. Krannawitter was charged with third-offense driving under the influence. Her motion to suppress was denied, and she was convicted. Krannawitter then filed a motion for new trial on the basis of newly discovered evidence. That motion was denied, and she was sentenced. Krannawitter appeals. We affirm.

## II. FACTUAL BACKGROUND

At approximately 6 a.m. on July 4, 2017, Deputy Dennis Guthard of the Lancaster County Sheriff's Department was leaving his home to report for work. Guthard was driving a marked cruiser. He noticed a black Nissan Altima driving slowly down the street of his neighborhood, of which he had been a resident for 16 years. Guthard's house was located on the corner of a street and a neighborhood circle. He drove from the circle onto the nearby through street and emerged behind the Altima. The Altima pulled into the driveway of Guthard's neighbors' house.

Guthard did not recognize the Altima or its driver, who he testified was a "younger woman" later identified as Krannawitter. Guthard testified that the occupants of the neighbors' house were a 70-year-old woman and her 96-year-old mother and that it was his experience that these two women did not wake until around 8:30 a.m. Guthard also testified that he considered keeping an eye on his neighborhood to be part of his job and that he was therefore aware of many of the vehicles belonging to persons who visited the neighborhood. Guthard noted that he often left for work at 6 a.m. and was therefore aware of who might be out and about at that time of the morning.

As Guthard drove down the street, he noticed, using his side and rear view mirrors, that the Altima was "just parked there" in the driveway. Guthard thought that was suspicious, but he also allowed for the possibility that the Altima's driver was lost, because it was a "confusing neighborhood." He therefore turned around at the next neighborhood circle to see if he could

be of assistance. As his cruiser approached the driveway, the driver of the Altima, who had been in the process of backing out of the driveway, paused for several seconds and then abruptly pulled back into the driveway and parked again. No other cars were traveling on the street at the time.

Guthard pulled into the driveway about 5 feet behind the Altima, but did not activate his cruiser's siren or lights. Guthard did turn the cruiser's camera on as he approached the Altima, and a video of the interaction between Guthard and Krannawitter was offered into evidence at trial.

Guthard made contact with the driver, Krannawitter. Immediately before Krannawitter opened the door of the Altima, Guthard observed Krannawitter was "very disheveled" and had droopy eyelids. When she opened the door, Guthard smelled a strong odor of alcohol and further noted Krannawitter's bloodshot eyes and slurred speech.

Krannawitter's breath test, administered approximately 90 minutes later, showed a concentration of .235 grams of alcohol per 210 liters of breath. Krannawitter was charged with aggravated driving under the influence, third offense. Krannawitter's motion to suppress was denied. The district court concluded that the initial stop of Krannawitter was a tier-one police-citizen encounter and that even if it was a seizure, there was reasonable suspicion to support a brief investigative stop.

Following a jury trial, Krannawitter was found guilty of driving under the influence. She filed a motion for new trial on the basis of newly discovered evidence. Krannawitter alleged that her breath test was performed using a machine that was maintained and tested using solutions that did not have certificates of analysis, in violation of title 177 of the Nebraska Administrative Code dealing with the testing of the alcohol content in blood and breath and in violation of her due process and confrontation rights. This argument centered on the testing solutions use to maintain the machine.

Krannawitter presented evidence that when sent to law enforcement, the solutions were accompanied by certificates

of analysis signed by Alma Palmer as the individual who pre-pared, tested, and supplied the solutions. Such a certificate is required by title 177. However, it was later determined that the solutions were actually prepared, tested, and supplied by Colby Hale. The company that delivered the solutions subsequently provided amended certificates, signed by Hale.

The district court concluded that the amended certificates were "not . . . newly discovered evidence" and that even if they were, the defect in the original certificates would not have ren-dered the breath test inadmissible. Accordingly, Krannawitter's motion was denied. Krannawitter was sentenced to 5 years' probation and a 15-year license revocation, with the possi-bility of obtaining an ignition interlock device after 1 year. She appeals.

## III. ASSIGNMENTS OF ERROR

Krannawitter assigns, restated and consolidated, that the district court erred in (1) denying her motion to suppress and (2) denying her motion for new trial.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to sup-press based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trig-ger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.[1]

[2] The standard of review for the denial of a motion for new trial is whether the trial court abused its discretion in denying the motion.[2]

---

[1] *State v. Hartzell*, 304 Neb. 82, 933 N.W.2d 441 (2019).

[2] *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

## V. ANALYSIS

### 1. Motion to Suppress

In her first assignment of error, Krannawitter assigns that the district court erred in denying her motion to suppress. In so denying, the district court noted that in its view, the interaction between Guthard and Krannawitter was a tier-one police-citizen encounter, but that in any case, the encounter was supported by reasonable suspicion. Krannawitter takes issue with both findings.

[3-5] There are three tiers of police encounters under Nebraska law. The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning.[3] This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. The second category, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*,[4] is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning.[5] This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.[6] The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention.[7] The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing

---

[3] *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019).

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). See, also, *State v. Schriner, supra* note 3.

[5] See *State v. Schriner, supra* note 3.

[6] *Id.*

[7] *Id.*

a crime.[8] Only the second and third tiers of police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.[9]

[6,7] A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.[10] In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled.[11]

We need not decide whether this encounter might have been a tier-one police-citizen encounter, because we conclude that in any case, it was a seizure supported by reasonable suspicion.

The U.S. Supreme Court has recognized that the Fourth Amendment permits brief investigative stops of vehicles based on reasonable suspicion when a law enforcement officer has a "'particularized and objective basis for suspecting the particular person stopped of criminal activity.'"[12] The reasonable suspicion needed to justify an investigatory traffic stop ""is dependent upon both the content of information possessed by police and its degree of reliability."'"[13] Like the probable cause standard, the reasonable suspicion standard "'takes into account "the totality of the circumstances—the whole

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Navarette v. California*, 572 U.S. 393, 396, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014).

[13] *State v. Barbeau*, 301 Neb. 293, 301, 917 N.W.2d 913, 921 (2018), quoting *Navarette v. California, supra* note 12.

picture."'"[14] A mere hunch does not create reasonable suspicion, but the level of suspicion required to meet the standard is ""considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause.'"[15]

Nervous, evasive behavior is a factor in determining reasonable suspicion.[16] Another consideration is unprovoked flight upon noticing the police.[17] Other pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred.[18]

In this case, Guthard was familiar with the neighborhood where the seizure took place because he lived in it. Specifically, Guthard testified that he was aware of those individuals who frequented the house of the neighbors in question, but did not recognize Krannawitter or her Altima. Because of this personalized knowledge regarding his own neighborhood, Guthard testified that the fact that Krannawitter was parked in the driveway in question at 6 a.m. was suspicious. Guthard thought it was possible that the driver might be lost, but his suspicion about the Altima and its occupants was reinforced when he circled back to check on the Altima and witnessed it begin to back out of the driveway, only to pause for an unknown reason and abruptly drive back into the driveway just as he approached in his marked cruiser. In his interaction with Krannawitter, Guthard indicated that he thought he should check on the property and on her, to be sure that she and her passengers were not attempting to break into the property.

---

[14] *Id.*

[15] *Id.*

[16] *U.S. v. Harris*, 313 F.3d 1228 (10th Cir. 2002).

[17] *Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).

[18] *U.S. v. Campbell*, 549 F.3d 364 (6th Cir. 2008).

Guthard witnessed what appeared to him to be evasive behavior when Krannawitter pulled out of and then immediately back into the neighbors' driveway. Based on his knowledge of the neighbors and the neighborhood in question, Guthard did not believe Krannawitter was visiting or acquainted with those neighbors such that there was a reason for her Altima to be parked in that driveway in the early morning hours. Guthard testified he considered it to be part of his job to keep an eye on his neighborhood. We conclude that when the totality of the circumstances is considered, Guthard's seizure of Krannawitter was supported by a particularized and objective basis for suspecting the particular person stopped of criminal activity.

### 2. Motion for New Trial

In her second assignment of error, Krannawitter assigns that the district court erred in denying her motion for new trial. In denying Krannawitter's motion for new trial, the district court found that the amended certificates of analysis were "not . . . newly discovered evidence," because they could have been discovered with reasonable diligence, and that in any case, the defect with the original certificates would not have rendered the breath test inadmissible.

[8] In order to obtain a new trial based on newly discovered evidence, a defendant must show that the new evidence could not with reasonable diligence have been discovered and produced at trial.[19] Additionally, the defendant must show the evidence is "so substantial that a different result may have occurred."[20] In other words, the defendant must show that if the evidence had been admitted at the former trial, it would probably have produced a substantially different result.

---

[19] See, Neb. Rev. Stat. §§ 29-2101(5) and 29-2103(4) (Reissue 2016); *State v. Cross*, 297 Neb. 154, 900 N.W.2d 1 (2017).

[20] *State v. Cross, supra* note 19, 297 Neb. at 161, 900 N.W.2d at 6.

### (a) Newly Discovered Evidence

The district court erred in finding that the amended certificates did not qualify as newly discovered evidence. A timeline of events relating to the certificates is helpful in determining this issue.

On June 29 and July 27, 2016, respectively, Palmer signed the original certificates of analysis of the solutions for testing concentrations of .08 and .15 milliliters of alcohol per 210 liters of breath, and the testing solutions were sent to Lancaster County. The solutions were those used to test and maintain the breath testing machine shortly before Krannawitter was arrested and tested on July 4, 2017.

Krannawitter's trial began on April 9, 2018. On that same date, Palmer signed affidavits stating that she had not tested those solutions, but that Hale had done that testing. It is not clear from the record how these affidavits came to be signed. On April 10, following a second day of trial, Krannawitter was found guilty. On May 7, Hale signed amended certificates of analysis, which were sent to Lancaster County. Krannawitter's motion for new trial was filed May 10. (The operative motion for new trial, however, is the amended motion for new trial, which was filed on July 27.)

Evidence is considered "newly discovered" if it "could not with reasonable diligence have [been] discovered and produced at the trial."[21] Defense counsel's affidavit indicates that he was not aware of the inaccuracy in the original certificates of analysis; nor is there any other evidence in the record to suggest that counsel should have been aware that the original certificates were incorrect. The amended certificates qualify as newly discovered evidence, and the district court erred in finding otherwise.

### (b) Substantially Different Result

We turn next to the question of whether, had the certificates been offered at trial, the results of that trial would have

---

[21] § 29-2101(5).

been substantially different. Krannawitter contends, within the framework of her motion for new trial, that (1) her breath test results were inadmissible, (2) she had a right to confront Palmer and Hale, (3) the certificates of analysis were inadmissible hearsay, and (4) the State violated Krannawitter's due process rights when it offered Palmer's affidavit at trial.

[9] Krannawitter's argument on appeal is based on her assertion that because the original certificates of analysis were incorrect, there was insufficient foundation to support the introduction of her chemical breath test results. The four foundational elements which the State must establish as a foundation for the admissibility of a breath test in a driving under the influence prosecution are as follows: (1) that the testing device was working properly at the time of the testing, (2) that the person administering the test was qualified and held a valid permit, (3) that the test was properly conducted under the methods stated by the Department of Health and Human Services, and (4) that all other statutes were satisfied.[22] The certificate of analysis at issue in this appeal is required by 177 Neb. Admin. Code, ch. 1, § 008.04A (2016), of the Department of Health and Human Services regulations. Krannawitter contends—as set forth above—that the State did not prove § 008.04A, which requires that the test be properly conducted under the methods stated by the Department of Health and Human Services.

But Krannawitter's assertion that there was improper foundation overlooks both the framework used to determine whether a motion for new trial should be granted and the substantive effect of the amended certificates. We agree with Krannawitter that together with Palmer's affidavit, the amended certificates of analysis showed that the *original* certificates were incorrect.

But we do not agree that this fact results in the conclusion that there was no foundation for the admission of the breath

---

[22] *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017).

test results. In addition to contributing to the evidence showing that the original certificates were incorrect, the amended certificates were independent foundational evidence supporting the admission of those results. And in addition to even these certificates, there was other evidence presented at the hearing on the amended motion for new trial that supported the admissibility of the results.

Krannawitter also argued that her confrontation rights were violated when she was not permitted to confront the witnesses against her, specifically naming Hale. The district court rejected this claim in its order, citing to *State v. Fischer*[23] wherein this court held that certificates of analysis similar to these are nontestimonial.

Krannawitter argues that our prior case law is distinguishable because there were *amended* certificates of analysis, the "primary purpose of [which] was to present after-the-fact evidence that the calibration verification was reliable so that the State could establish that the testing device was working properly at the time the breath test was administered."[24] While we understand the distinction Krannawitter relies upon, we find that it makes no difference in this case.

In concluding that such certificates of analysis were nontestimonial, this court in *Fischer* reasoned that the statements in a certificate "did not pertain to any particular pending matter" and that the certificate "was prepared in a routine manner without regard to whether the certification related to any particular defendant."[25]

This reasoning is also applicable to the amended certificates now at issue. There is no indication from the face of the amended certificates that they were prepared for a particular criminal proceeding. Rather, the testimony of one of the

---

[23] *State v. Fischer*, 272 Neb. 963, 726 N.W.2d 176 (2007).

[24] Brief for appellant at 30-31.

[25] *State v. Fischer, supra* note 23, 272 Neb. at 971, 972, 726 N.W.2d at 182, 183.

maintenance officers indicated that the amended certificates were "additional documentation" received by the county in connection with the simulator solutions in the county's possession and that the only difference between the original and the amended certificates was the name of the person who tested the solutions.

Moreover, the record shows that that the amended certificates were received by Lancaster County after the time Krannawitter was convicted and before the date Krannawitter filed her motion for new trial. Just as the original certificates were nontestimonial, so also were the amended certificates. There is no merit to Krannawitter's contention to the contrary.

Whether there was sufficient foundation for the admission of those results is a question for the trial court.[26] At the hearing on the motion for new trial, the district court found that the foundational elements were met and that the results were admissible. As such, the trial court concluded that the results of a trial where the amended certificates of analysis were offered would not have been substantially different.

We need not reach Krannawitter's arguments on appeal regarding her due process rights, or whether the certificates of analysis were inadmissible hearsay, because neither was raised in her amended motion for new trial or at the hearing on that motion.

The trial court did not abuse its discretion in denying Krannawitter's amended motion for new trial.

## VI. CONCLUSION

The judgment and sentence of the district court are affirmed.

AFFIRMED.

---

[26] See *State v. Richardson*, 285 Neb. 847, 830 N.W.2d 183 (2013).