Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/09/2020 09:08 AM CDT

State of Nebraska, appellee, v.
Richard J. Saitta, appellant.
___ N.W.2d ___

Filed July 17, 2020.    No. S-19-697.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Search and Seizure: Appeal and Error.** An appellate court applies a two-part analysis when reviewing whether a consent to search was voluntary. As to the historical facts or circumstances leading up to a consent to search, the appellate court reviews the trial court's findings for clear error. However, whether those facts or circumstances constituted a voluntary consent to search, satisfying the Fourth Amendment, is a question of law, which the appellate court reviews independently of the trial court. And where the facts are largely undisputed, the ultimate question is an issue of law.

3. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Search and Seizure: Investigative Stops: Arrests: Probable Cause: Words and Phrases.** There are three tiers of police-citizen encounters under Nebraska law. The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. The second category, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is limited to brief, nonintrusive detention during a frisk for weapons or

preliminary questioning. This type of encounter is considered a seizure sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime. Only the second and third tiers of police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.

4. **Constitutional Law: Search and Seizure.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled.

5. **Police Officers and Sheriffs: Investigative Stops: Time.** An investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

6. **Police Officers and Sheriffs: Investigative Stops: Probable Cause.** Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis.

7. **Police Officers and Sheriffs: Probable Cause.** In determining whether a police officer acted reasonably, it is not the officer's inchoate or unparticularized suspicion or hunch that will be given due weight, but the specific reasonable inferences which the officer is entitled to draw from the facts in light of the officer's experience.

8. **Constitutional Law: Warrantless Searches: Search and Seizure.** Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to a few established and well-delineated exceptions.

9. **Warrantless Searches.** The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.

10. **Warrantless Searches: Motor Vehicles.** Nebraska has recognized that among the established exceptions to the warrant requirement is the automobile exception.

11. **Warrantless Searches: Probable Cause.** Probable cause, standing alone, is not an exception that justifies the search of a person without a warrant.

12. **Warrantless Searches.** One well-recognized exception to the warrant requirement is a search undertaken with consent.

13. **Constitutional Law: Search and Seizure: Duress.** Generally, to be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne.

14. **Warrantless Searches: Duress.** Consent must be given voluntarily and not as a result of duress or coercion, whether express, implied, physical, or psychological.

15. **Constitutional Law: Search and Seizure.** The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law.

16. **Search and Seizure.** Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent.

17. ____. Consent to search may be implied by action rather than words.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Mary M. Dvorak for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

MILLER-LERMAN, J.
## NATURE OF CASE
Richard J. Saitta appeals his conviction and sentence in the district court for Douglas County for possession of a controlled substance. The court overruled Saitta's motion to suppress evidence, and thereafter in a bench trial, it found Saitta guilty and sentenced him to probation for 1 year. Saitta claims

on appeal that the court erred when it overruled his motion to suppress. We affirm Saitta's conviction and sentence.

## STATEMENT OF FACTS

Saitta was arrested on July 3, 2018, after police officers found a clear plastic bag containing a substance later identified as methamphetamine inside a glove worn by Saitta. Before trial, Saitta filed a motion to suppress all evidence obtained as a result of his encounter with the police on July 3. He asserted that he was seized in violation of the Fourth Amendment because the police did not have reasonable suspicion to detain and question him and that the search of his personal effects was in violation of the Fourth Amendment because the circumstances did not justify a search without a warrant.

At a hearing on the motion to suppress, the State presented the testimony of Cory Buckley, one of the police officers who arrested Saitta. Buckley's testimony is set forth in more detail below. During Buckley's testimony, the State offered and the court received into evidence a video recording from Buckley's body camera depicting Buckley's encounter with Saitta. During Saitta's cross-examination of Buckley, Saitta offered and the court received into evidence three still photographs depicting the scene of the encounter. The State offered no further testimony or evidence, and Saitta offered no other evidence in his defense.

Buckley testified that he was an officer with the Omaha Police Department. At approximately 5:43 a.m. on July 3, 2018, he and his partner were driving on patrol, and as they drove past an alleyway, they observed a person who appeared to be looking into the window of a building that was in the process of being demolished. Buckley testified that he had been aware of the building's being demolished and that he had made observing the building part of his regular route on patrol because there had been problems with trespassers and people sleeping in the building. He was also aware that there had been "scrappers in that area," which as he further described

meant that "[w]herever there's buildings under construction, there's people trying to take metals out of the building being demolished . . . for money."

Upon observing a person in the alley, the officers stopped and backed up their patrol car to get a closer look; Buckley testified that he "believe[d] the person saw us because when we reversed the person was gone." They turned into the alley to try to make contact or to see if the person had entered the building; as they drove into the alleyway, they noticed the person, who would later be identified as Saitta, "hiding in the bushes" that were "up against the building." Buckley testified that the officers' purpose in making contact with Saitta was "[j]ust to see why he was looking in the building" and to "[b]asically, identify him, make sure he's not breaking in, not stealing anything, that he actually belongs in that area."

When the officers got out of their patrol car, Saitta came "out of the bushes to make contact with" them. As Saitta came out of the bushes, Buckley saw "him shove something into his left glove with his right hand." Buckley observed upon initial contact that Saitta was "super nervous" and "did not like [the officers'] being there." Buckley also observed, based on his "training and experience," that the glove Saitta was wearing on his left hand was of "the kind of gloves that are used by like electricians, so they don't cut their hands up when they're dealing with wires." Buckley's partner asked Saitta what he was doing and whether he was breaking into the building; Saitta replied that he was doing nothing and that he did not have any tools on him, and he put his hands in the air. Buckley's partner then asked Saitta, "'Well, what's this pile of metal doing right here?'" as he gestured toward a small pile of scrap metal that was "[u]p against the building, right by the bush . . . where [Saitta] came out of from behind." Saitta replied that the metal was not his, and then "he began to back away from" the officers. When Saitta began to back away, Buckley "put [his] hand on [Saitta's] back to get him to stop."

Buckley replied in the affirmative to the State's question whether he "inquire[d] to [Saitta] what was in his glove." He then testified that he "asked [Saitta] to remove the glove and [Saitta] complied." Buckley then "asked [Saitta] to hand [him] the glove," and when Saitta handed the glove to him, Buckley saw that "inside the glove was a clear plastic bag" that contained a substance that "later field-tested positive for methamphetamine." Upon finding the bag and its contents, the officers "immediately placed [Saitta] into handcuffs" and arrested him.

On cross-examination, Saitta referred to Buckley's testimony that he "asked" Saitta to remove his glove. Saitta asked Buckley whether "[i]n fact, [he] directed [Saitta] to remove his gloves," and whether he "told [Saitta] to give it to [him] so that [he] could inspect it." Buckley agreed with both characterizations. Buckley also agreed with Saitta's characterization that he and his partner got only a "fairly quick glance" at Saitta when he was looking into a window of the building as they first drove past the alleyway and before they reversed course and turned into the alley. Buckley acknowledged that he had not previously encountered anyone trying to steal scrap metal from that particular building. Buckley further acknowledged that when he approached Saitta, he did not observe any metal in Saitta's hands and did not observe a vehicle, shopping cart, or other mode of transport available to carry metal. Buckley acknowledged that he and his partner had not found evidence that Saitta was trying to take metal from the building and that at the date of the suppression hearing, he did not "actually know whether . . . Saitta was or was not attempting to get metal from this particular building."

Following the suppression hearing, the district court filed an order overruling Saitta's motion to suppress. The district court evaluated the evidence and, at the beginning of its analysis, stated with regard to the glove that "this is not a 'seizure' as characterized by" Saitta. Instead, the court found that "Officer Buckley simply asked [Saitta] for his glove and [Saitta] gave

it to him. There was no seizure at all." Despite this finding, the court discussed arguendo that there had been a seizure of the glove and continued its analysis accordingly.

After discussing the different levels of police-citizen encounters, the court determined that the encounter between Saitta and the officers began as a "tier-one encounter" in which Saitta's liberty was not constrained but then became an "investigatory stop," or a "tier-two encounter," which enjoys a level of Fourth Amendment protection. The court found that the investigatory stop was proper "because, under the totality of the circumstances, the officers had reasonable suspicion that [Saitta] had, was about to, or was in the process of committing a crime." The court noted Buckley's testimony that he saw Saitta when he was looking into the building at around 5:43 a.m., that he knew the building was in the process of being demolished and individuals frequently stole scrap metal from such buildings, and that when he and his partner drove into the alley, Saitta tried to hide in the bushes. The court found these to be "specific and articulable facts that criminal activity was afoot," and it concluded that reasonable suspicion supported a lawful detention for an investigatory stop.

The court then reviewed law to the effect that searches without a valid warrant are per se unreasonable, subject to certain exceptions. The court noted that in addition to the evidence which supported reasonable suspicion justifying the investigatory stop, Buckley testified that he saw Saitta put something in his left glove when the officers approached him. The court found that it was "reasonable for the officers to believe the furtive gestures of [Saitta were] an attempt to conceal items of a crime." The court concluded that "probable cause existed in order to justify the search of [Saitta's] glove" and that Saitta's "Fourth Amendment rights were not violated because probable cause existed." The court overruled Saitta's motion to suppress.

After Saitta waived his right to a jury trial, the court conducted a bench trial in which the State offered two exhibits—a

stipulation of the parties regarding laboratory testing of the substance in the plastic bag found in Saitta's glove and separately the transcript of the suppression hearing. Saitta objected to the admission of both exhibits based on the reasons set forth in his motion to suppress, and he renewed the motion to suppress. The court overruled the renewed motion to suppress and received the evidence over Saitta's objection. Saitta offered no evidence in his defense, and the court thereafter found Saitta guilty of possession of a controlled substance. After hearing argument by the parties on the issue of sentencing, the court sentenced Saitta to probation for a term of 1 year.

Saitta appeals his conviction and sentence.

## ASSIGNMENTS OF ERROR

Saitta claims generally that the district court erred when it overruled his motion to suppress. He specifically claims the court erred when it determined that (1) reasonable and articulable suspicion of criminal activity existed to support Saitta's detention, (2) probable cause existed to search Saitta's glove, and (3) probable cause to conduct a search provides a valid exception to the Fourth Amendment's warrant requirement.

## STANDARDS OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Degarmo*, 305 Neb. 680, 942 N.W.2d 217 (2020). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id*.

[2] Likewise, we apply the same two-part analysis when reviewing whether a consent to search was voluntary. *Id*. As to the historical facts or circumstances leading up to a consent to search, we review the trial court's findings for clear error. *Id*. However, whether those facts or circumstances constituted a

voluntary consent to search, satisfying the Fourth Amendment, is a question of law, which we review independently of the trial court. *State v. Degarmo, supra*. And where the facts are largely undisputed, the ultimate question is an issue of law. *Id*.

## ANALYSIS

Saitta claims that the district court erred when it overruled his motion to suppress evidence obtained as a result of his encounter with police on July 3, 2018. He generally challenges two aspects of the encounter: the seizure of his person and the search of his glove. He argues that the seizure of his person was illegal because the police lacked reasonable suspicion for an investigatory stop, and he argues that the search of the glove was illegal both because the police lacked probable cause to conduct the search and because probable cause alone does not justify a search without a warrant. We conclude that the seizure of Saitta's person was proper because the police had reasonable suspicion to conduct an investigatory stop, and we conclude that the search of the glove was proper because it was undertaken with consent.

*Seizure of Saitta's Person Was Proper Because*
*Police Had Reasonable Suspicion to*
*Conduct an Investigatory Stop.*

We first address whether the seizure of Saitta's person was proper. The evidence Saitta sought to suppress was found as a result of the search of the glove, and that search occurred as a result of the seizure of Saitta's person. Therefore, if the seizure was illegal, then evidence obtained from the search of the glove should have been suppressed. However, we conclude that the detention of Saitta was an investigatory stop that was justified by reasonable suspicion.

The State acknowledges that Saitta was detained at the point that Buckley, as he testified, "put [his] hand on [Saitta's] back to get him to stop." The State contends, and we agree, that prior to that time, the encounter involved no restraint on Saitta's liberty. The State further contends that Buckley's

act of detaining Saitta by putting his hand on Saitta's back was justified as an investigatory stop supported by reasonable suspicion.

[3] There are three tiers of police-citizen encounters under Nebraska law. The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. *State v. Krannawitter*, 305 Neb. 66, 939 N.W.2d 335 (2020). This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. *State v. Krannawitter, supra*. The second category, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *State v. Krannawitter, supra*. This type of encounter is considered a seizure sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. *State v. Krannawitter, supra*. The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. *Id*. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime. *State v. Krannawitter, supra*. Only the second and third tiers of police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution. *State v. Krannawitter, supra*.

[4] A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Krannawitter, supra*. In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure

may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled. *Id*.

[5] In this case, a seizure occurred when Buckley physically touched Saitta with the purpose of stopping him from walking away. An investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id*. In this case, the investigatory stop of Saitta was brief and did not extend beyond what was necessary to investigate the suspicion that prompted Buckley to stop Saitta. Although Saitta was arrested soon after Buckley stopped him from walking away, the arrest was based on the discovery of the bag containing methamphetamine, and Saitta does not assert the arrest per se was improper. Instead, he contends the investigatory stop that led to the arrest was improper. We must therefore consider whether Buckley had "specific and articulable facts sufficient to give rise to reasonable suspicion that [Saitta had] committed or [was] committing a crime" and whether he was therefore justified in detaining Saitta for an investigatory stop. See *State v. Krannawitter*, 305 Neb. 66, 71, 939 N.W.2d 335, 341 (2020).

[6,7] As we have said above, an investigatory stop of a person requires that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. See *id.* Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis. *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). In determining whether a police officer acted reasonably, it is not the

officer's inchoate or unparticularized suspicion or hunch that will be given due weight, but the specific reasonable inferences which the officer is entitled to draw from the facts in light of the officer's experience. *Id.*

In this case, Buckley and his partner saw a person looking into the window of a building that was in the process of being demolished. Buckley was familiar with the building because it was on the route of his regular patrol. He knew of complaints about people trespassing and sleeping in the building, and he was also familiar in a general sense that people sometimes took scrap metal from buildings being demolished. Based on the time of day, 5:43 a.m., Buckley could reasonably infer that the person was not there for a proper purpose related to the building, and based on his general and specific knowledge, he could infer the person might be trespassing and possibly attempting to steal metal from the building. During their initial voluntary encounter with Saitta, Buckley and his partner made further observations relevant to suspicion of criminal activity. Buckley's partner saw a small pile of scrap metal, and he asked Saitta about it. Buckley saw Saitta "shove something into his left glove," and Buckley knew the glove to be the type one might wear when handling wires. Based on this knowledge and knowing that it was a time of year—July—when one would not normally be wearing gloves, Buckley had additional reason to suspect Saitta might be trying to take metal from the building.

We conclude that considering the totality of the circumstances, including the aforementioned observations and reasonable inferences from his knowledge as an officer, at the time he detained Saitta, Buckley had a reasonable suspicion based on specific and articulable facts that Saitta had committed or was committing a crime. The investigative stop of Saitta was supported by reasonable suspicion, and therefore, the court did not err when it denied the motion to suppress to the extent the motion relied on an allegedly illegal seizure of Saitta's person.

*Search of Saitta's Glove Was Proper Because
It Was Undertaken With Consent.*

We next consider whether the search of Saitta's glove violated the Fourth Amendment. Saitta argues that the district court erred when it determined that the officers had probable cause to search the glove and when it determined that probable cause in itself is an exception to the warrant requirement. The State concedes that probable cause alone did not justify the warrantless search and that the district court's reasoning was erroneous. See *State v. Perry*, 292 Neb. 708, 874 N.W.2d 36 (2010). Notwithstanding the district court's rationale, the State argues that an exception to the warrant requirement was present because the search was incident to an arrest that was supported by probable cause. However, we need not consider whether there was a proper search incident to an arrest because we conclude that, given the district court's factual finding, a warrantless search was proper in this case for the reason that it was within a different exception to the warrant requirement— that is, it was conducted with consent.

[8-10] Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to a few established and well-delineated exceptions. *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019). The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *State v. Degarmo*, 305 Neb. 680, 942 N.W.2d 217 (2020). We have also recognized that among the established exceptions to the warrant requirement is the automobile exception. *State v. Lang*, 305 Neb. 726, 942 N.W.2d 388 (2020).

[11] The district court in this case determined that "probable cause existed in order to justify the search of [Saitta's] glove." However, as Saitta recognizes, we have said that "probable cause, standing alone, is not an exception that justifies the search of a person without a warrant." *State v. Perry*, 292 Neb.

at 713, 874 N.W.2d at 41. See, also, *City of Beatrice v. Meints*, 289 Neb. 558, 567, 856 N.W.2d 410, 417 (2014) ("probable cause, standing alone, is not an exception to the search warrant requirement of the Fourth Amendment as applied to real property"). Compare *State v. Lang*, 305 Neb. at 740, 942 N.W.2d at 400 (automobile exception applies "when a vehicle is readily mobile and there is probable cause to believe that contraband or evidence of a crime will be found in the vehicle").

As noted above, the State acknowledges that "probable cause to search Saitta's glove, as articulated in the district court's written order, is insufficient to resolve whether a Fourth Amendment violation occurred." Brief of appellee at 20. The State argues, however, that the "search incident to lawful arrest" exception applies. *Id.* The State explains that for the same reasons the officers had reasonable suspicion to conduct an investigatory stop of Saitta, they also had probable cause to arrest Saitta "for a criminal offense, such as trespassing, burglary, or theft, or an attempt to commit any of those offenses." *Id.* at 21. Although the officers eventually arrested Saitta for possession of methamphetamine and did not have probable cause related to that offense until the search of the glove, the State maintains that probable cause for one of the other asserted crimes justified the search as a search incident to arrest.

The State's argument regarding search incident to arrest is problematic because, inter alia, although the officers' observations were sufficient to provide reasonable suspicion to investigate possible criminal activity such as trespass or theft, the search occurred early in the investigation and at a time when the officers did not yet have probable cause to arrest Saitta for those crimes. In this regard, we note that Buckley conceded at the suppression hearing that he and his partner had not found evidence that Saitta was trying to take metal from the building and that even at the date of the suppression hearing, he did not "actually know whether . . . Saitta was or was not attempting to get metal from this particular building."

[12-16] We need not further consider the State's argument related to search incident to arrest because we determine that a different exception to the warrant requirement applies in this case—the exception for a search undertaken with consent. One well-recognized exception to the warrant requirement is a search undertaken with consent. *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019). Generally, to be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne. *State v. Degarmo*, 305 Neb. 680, 942 N.W.2d 217 (2020). Consent must be given voluntarily and not as a result of duress or coercion, whether express, implied, physical, or psychological. *Id*. The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law. *State v. Degarmo, supra*. Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent. *Id*.

In its order, the district court began its analysis by stating with regard to the glove that "this is not a 'seizure' as characterized by" Saitta. Instead, the court found that "Officer Buckley simply asked [Saitta] for his glove and [Saitta] gave it to him. There was no seizure at all." This order includes findings of fact that Buckley "simply asked" Saitta for the glove and that Saitta "gave it to him." Based on those facts, the court made a conclusion of law that there was no Fourth Amendment violation because there was no seizure.

On appeal, we review the findings of fact for clear error, but we reach an independent legal conclusion as to whether those facts trigger or violate Fourth Amendment protections. See *State v. Degarmo, supra*. We determine the district court's fact findings in this case were not clearly erroneous. Contrary to the district court's analysis, to the effect that the import of those facts was that there was no seizure, we conclude that those factual findings support the legal conclusion that the circumstances constituted a voluntary consent to the search of the glove.

First, we review the fact findings for clear error. The court found that Buckley "simply asked" for the glove. This finding is relevant to our legal analysis of consent because it goes to whether the officers employed duress or coercion to effect the search of the glove. There was some conflict in the evidence on this fact because although in direct testimony Buckley testified that he "asked" Saitta, on cross-examination, he agreed to Saitta's characterizations that he "directed" or "told" Saitta to give him the glove. The court credited Buckley's characterization on direct examination over his agreement with Saitta's characterization on cross-examination. The court was also able to view the video from Buckley's body camera. From our review of the video, we note that in the video, Buckley appears to say to Saitta, "Let me see your glove." Although these words may be ambiguous as to whether it is a request or a command, the court was able to judge Buckley's tone of voice and the circumstances and it found that Buckley "simply asked" for the glove. After the district court viewed the video and listened to the testimony, and following our review of the record, we conclude that the finding of the district court was not clearly erroneous.

The court also found that Saitta "gave" Buckley the glove. This is also relevant to consent because it goes to whether Saitta made a free and unconstrained choice or whether his will was overborne and he merely acquiesced to duress or coercion. There does not appear to be conflict in Buckley's testimony that Saitta gave him the glove. The video shows that Buckley did not forcefully take the glove but that instead, almost immediately after Buckley said, "Let me see your glove," Saitta, without hesitation or protest, handed the glove to Buckley. The finding that Saitta "gave" the glove to Buckley was also not clearly erroneous.

[17] From these fact findings and our review of the record, we reach a legal conclusion that the search of the glove was undertaken with consent. Buckley "simply asked" for the glove and Saitta "gave" it to him. These facts show and the record

supports that Buckley did not use coercion or duress when he asked to see the glove, and Saitta almost immediately handed the glove to Buckley without hesitation or protest, showing that his will was not overborne and that he did not merely acquiesce to duress or coercion. Although Saitta did not verbally indicate his consent, we have held that consent to search may be implied by action rather than words. See *State v. Modlin*, 291 Neb. 660, 867 N.W.2d 609 (2015) (noting that defendant allowed phlebotomist to draw his blood without doing anything to manifest refusal). See, also, *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001) (noting that after request to search his home, defendant responded by stepping back and gesturing with his arms raised and his hands outward and upward); *State v. Juhl*, 234 Neb. 33, 42, 449 N.W.2d 202, 209 (1989), *disapproved on other grounds, State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991) (noting that defendant's right to be free from unreasonable search and seizure was not violated when, in response to question from police officer as to what he had in his jacket, the defendant raised his right arm and said, "'[C]heck'"). Saitta handed the glove to Buckley upon request, and consent may be implied from such action. We conclude that Buckley's search of the glove was undertaken with consent and that therefore, the court did not err when, to the extent Saitta asserted an illegal search, it overruled his motion.

## CONCLUSION

Because the detention of Saitta was an investigatory stop justified by reasonable suspicion and because the search of the glove was undertaken with consent, we conclude that the district court did not err when it overruled Saitta's motion to suppress the evidence obtained as a result of the seizure of his person and the search of his glove. We therefore affirm Saitta's conviction and sentence.

Affirmed.