Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/04/2025 09:09 AM CST

State of Nebraska, appellee, v.
Mark J. Porter, appellant.

___ N.W.3d ___

Filed February 25, 2025.    No. A-24-028.

1. **Criminal Law: Courts: Appeal and Error.** In an appeal of a criminal
   case from the county court, the district court acts as an intermediate
   court of appeals, and its review is limited to an examination of the
   record for error or abuse of discretion.
2. **Courts: Appeal and Error.** Both the district court and a higher appel-
   late court generally review appeals from the county court for error
   appearing on the record.
3. **Judgments: Appeal and Error.** When reviewing a judgment for errors
   appearing on the record, an appellate court's inquiry is whether the deci-
   sion conforms to the law, is supported by competent evidence, and is
   neither arbitrary, capricious, nor unreasonable.
4. **Appeal and Error.** An appellate court independently reviews questions
   of law in appeals from the county court.
5. **Criminal Law: Courts: Appeal and Error.** When deciding appeals
   from criminal convictions in county court, an appellate court applies the
   same standards of review that it applies to decide appeals from criminal
   convictions in district court.
6. **Constitutional Law: Search and Seizure: Appeal and Error.** An
   appellate court applies a two-part analysis when reviewing whether a
   consent to search was voluntary. As to the historical facts or circum-
   stances leading up to a consent to search, the appellate court reviews
   the trial court's findings for clear error. However, whether those facts
   or circumstances constituted a voluntary consent to search, satisfying
   the Fourth Amendment, is a question of law, which the appellate court
   reviews independently of the trial court. And where the facts are largely
   undisputed, the ultimate question is an issue of law.
7. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal
   conviction for a sufficiency of the evidence claim, whether the evidence

is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

8. **Constitutional Law: Motions to Suppress: Confessions: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

9. **Motions to Suppress: Investigative Stops: Warrantless Searches: Probable Cause: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on the Fourth Amendment, an appellate court will uphold its findings of fact unless they are clearly erroneous. But an appellate court reviews de novo the trial court's ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search.

10. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.

11. **Arrests: Search and Seizure: Probable Cause: Words and Phrases.** An arrest is a highly intrusive detention (seizure) of a person that must be justified by probable cause.

12. **Warrantless Searches: Probable Cause: Police Officers and Sheriffs.** Probable cause to support a warrantless arrest exists only if the officer has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime.

13. **Probable Cause: Words and Phrases.** Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances.

14. **Probable Cause: Appeal and Error.** An appellate court determines whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances.

15. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation

unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. The safeguards provided by *Miranda* come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.

16. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** Under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement after a person has been taken into custody or is otherwise deprived of his or her freedom of action in any significant way.

17. **Miranda Rights.** The ultimate inquiry for determining whether a person is "in custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

18. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** The term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

19. **Miranda Rights: Police Officers and Sheriffs.** The circumstances that are most relevant to the custody inquiry include: (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to leave; (2) whether the contact with the police was initiated by them or by the person interrogated, and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used other interrogation techniques to pressure the suspect; and (8) whether the police manifested to the defendant a belief that the defendant was culpable and that they had the evidence to prove it.

20. **Constitutional Law: Search and Seizure: Blood, Breath, and Urine Tests.** The drawing of blood from a person's body for the purpose of administering blood tests is a search of the person subject to Fourth Amendment constraints.

21. **Constitutional Law: Search and Seizure: Warrantless Searches.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions.

22. **Warrantless Searches.** The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.

23. **Warrantless Searches: Proof.** It is the State's burden to show that a search falls within an exception to the warrant requirement.

24. **Constitutional Law: Search and Seizure: Duress.** Generally, to be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne.

25. **Warrantless Searches: Duress.** Consent for a warrantless search must be given voluntarily and not as a result of duress or coercion, whether express, implied, physical, or psychological.

26. **Constitutional Law: Search and Seizure.** The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law.

27. **Search and Seizure.** Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent.

28. **Police Officers and Sheriffs: Warrantless Searches.** While there is no requirement that police must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search, knowledge of the right to refuse is a factor to be considered in the voluntariness analysis.

29. **Constitutional Law: Blood, Breath, and Urine Tests.** A court may not rely solely on the existence of an implied consent statute to conclude that consent to a blood test was given for Fourth Amendment purposes, and the determination of whether consent was voluntarily given requires a court to consider the totality of the circumstances.

Appeal from the District Court for Hall County, RYAN C. CARSON, Judge, on appeal thereto from the County Court for Hall County, ALFRED E. COREY III, Judge. Judgment of District Court affirmed.

T. Charles James, of Langvardt, Valle & James, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

Riedmann, Chief Judge, and Moore and Welch, Judges.

Welch, Judge.

## I. INTRODUCTION

Mark J. Porter appeals from the order of the Hall County District Court affirming his county court convictions for aggravated driving under the influence of alcohol (DUI) (blood alcohol .15 or greater), a Class W Misdemeanor, and traveling the wrong way on a one-way roadway, an infraction. Porter asserts that the district court erred in affirming the county court's overruling of his motion to suppress and in finding that the evidence was sufficient to support his convictions. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. Facts Leading to Arrest

On October 22, 2021, at 12:40 a.m., law enforcement officers responded to a report of a personal injury motor vehicle accident at Second and Oak Streets in Grand Island, Nebraska. Second Street is a three-lane, one-way road permitting westbound traffic only. Multiple officers responded to assist with traffic control and to contain the scene.

When Officer Damian McAlevy arrived at the scene, he observed a Ford Edge with heavy front-end damage and a missing tire that appeared to be in the middle of the roadway, a knocked over light pole near the Ford Edge, and a Nissan sedan facing toward the northeast that had also sustained heavy front-end damage. Officer McAlevy contacted the Nissan's driver and passenger. The Nissan's driver informed Officer McAlevy that "he was traveling westbound down Second Street and the other vehicle was traveling towards him the wrong way on a one-way." The Nissan's passenger provided a similar account of the events. Another witness "claimed that she saw one vehicle traveling eastbound on Second, the other

one traveling westbound" but the witness was unsure which vehicle was traveling in the wrong direction.

Officer McAlevy testified that he observed an individual, whom he identified as Porter, standing next to the Ford Edge. Porter indicated that he owned the Ford and that he was driving it at the time of the accident. Officer McAlevy observed Porter to have bloodshot and watery eyes and slurred speech. Officer McAlevy also noted that Porter was disoriented and unfocused and that Porter's responses were delayed.

Porter was examined by medical personnel on scene. Medical personnel did not express any concerns about Porter's ability to understand their questions or his competence to be able to refuse medical treatment, nor did they observe any significant injuries. After Porter refused medical care, Officer McAlevy reinitiated contact with Porter, this time noting that there was an "odor of alcohol coming from his person," that Porter was swaying, and that he was struggling to maintain his balance. After Porter stated he was headed home, Officer McAlevy asked Porter which way he was headed and Porter "point[ed] to the south, southeast." Officer McAlevy noted that although Porter indicated that he was heading home, the location of Porter's residence was not located to the south or southeast as indicated by Porter but was actually located on the west side of town, which was inconsistent with the direction that Porter indicated he was traveling.

Based upon his observations, Officer McAlevy began a 15-minute observation period of Porter in preparation for conducting a preliminary breath test (PBT). During the observation period, Officer McAlevy "maintain[ed a] visual" of Porter while also getting the forms and PBT ready. During the 15-minute period, Porter was in the company of either a law enforcement officer or a paramedic/firefighter. During the observation period, Porter made statements to Officer McAlevy, including an admission that he was coming from a bar and had two alcoholic drinks of "Crown and water" while he was there. Based upon Porter's statements, including his

admission of consuming alcohol, along with Officer McAlevy's observations of Porter, Officer McAlevy suspected that Porter had been driving under the influence.

After the 15-minute observation period had passed, Officer McAlevy administered the PBT, which Porter failed with a .216 result. Officer McAlevy arrested Porter for DUI and read Porter the postarrest chemical test advisement form that advised Porter he was under arrest, discussed the collection of a chemical sample, and allowed Porter to consent to providing a sample. Porter subsequently signed the form consenting to a blood sample. He was placed in handcuffs and was transported to a hospital where a blood sample was drawn. The sample revealed that Porter's blood alcohol content was .226.

## 2. Complaint

In November 2021, the State filed a complaint in the Hall County Court charging Porter with first offense aggravated DUI in violation of Neb. Rev. Stat. § 60-6,196 (Reissue 2021) and traveling the wrong way on a one-way roadway in violation of Neb. Rev. Stat. § 60-6,138 (Reissue 2021).

## 3. Motion to Suppress

In February 2022, Porter filed a motion to suppress evidence obtained by law enforcement alleging that the detention, search, interrogation, and the arrest of his person, violated his 4th, 5th, and 14th Amendment rights. During the suppression hearing, the State adduced testimony from Officer McAlevy, as well as Officer Tyler Noel. Porter argued that law enforcement did not have a reasonable suspicion to believe he was under the influence when he was detained, that law enforcement did not have probable cause to arrest him for DUI, that law enforcement did not have probable cause to believe he was driving under the influence of alcohol because the PBT was not administered in compliance with 177 Neb. Admin. Code ch. 1 (2016) (Title 177), that his Fifth Amendment rights were violated when law enforcement elicited statements from

him prior to reading him his *Miranda* rights, that law enforcement did not seek a warrant to arrest him under Neb. Rev. Stat. § 29-404.02 (Cum. Supp. 2022), and that the warrantless blood draw was illegally obtained.

Following the hearing, the county court denied Porter's motion to suppress in its entirety. Specifically, the county court found that law enforcement officers had reasonable grounds to believe that Porter committed the offense of DUI and had probable cause to arrest Porter for DUI; that law enforcement did not violate Title 177 as it related to the 15-minute observation period in preparation for a PBT; that in light of the officer's testimony, Porter's allegations related to the calibration of the PBT unit were meritless; that *Miranda* warnings were not required during the 15-minute observation period during which Porter made incriminating statements to law enforcement; and that a warrant for the blood draw was not required as a result of Porter's consent on the postarrest chemical advisement form.

## 4. Motion to Reconsider

In August 2022, Porter filed a motion to reconsider the county court's order overruling his motion to suppress, claiming that video footage from Officer McAlevy's body camera contradicted the officer's testimony governing Porter's condition and the events that transpired during the 15-minute observation period. Following a hearing, the county court overruled the motion to reconsider, stating:

> The Court bases its decision on multiple factors. First, Officer McAlevy requested [another officer] to watch [Porter] during the fifteen-minute observation period while he was at his cruiser. Next, Officer McAlevy stated that other officers were on the scene and made observations of [Porter]. Finally, Officer McAlevy said when he was outside the [Grand Island Fire Department] vehicle, he was able to see [Porter] through the windows for this brief period. Considering these factors, [Porter's]

Motion to Reconsider its Motion to Suppress is denied. The Court's previous analysis in its original order is applicable to this Motion to Reconsider based on where Officer McAlevy and other officers were located during the fifteen-minute observation period of [Porter]. Law enforcement was in [Porter's] presence for the entire fifteen-minute period based on the evidence received by the Court.

## 5. Trial and Sentencing

During the March 2023 bench trial, witnesses included a medical laboratory technician; Nicole Meier, a medical laboratory scientist; the Nissan's passenger; the Nissan's driver; and Officer McAlevy. The evidence adduced was consistent with the facts as laid out above. The county court found that the State met its burden to prove Porter was operating a motor vehicle with a blood concentration over 0.15, that Porter's blood test results complied with Title 177 and were admissible, and that the State met its burden of proof beyond a reasonable doubt as to both counts contained in the complaint.

Thereafter, the county court sentenced Porter for aggravated DUI (.15 or greater) to 9 months of probation with 2 days of jail time, a $500 fine, and revocation of his license for a period of 1 year. For his conviction for traveling the wrong way on a one-way roadway, the county court fined Porter $100.

## 6. Appeal to District Court

Porter timely appealed his convictions and sentences to the Hall County District Court. On appeal to the district court, Porter's statement of errors included numerous allegations. The statement of errors that match the errors assigned in this appeal are the county court erred in overruling Porter's motion to suppress by "relying upon an improperly administered [PBT] that lacked adequate foundation, and which was conducted without reasonable suspicion, and which failed to establish probable cause to arrest [Porter] for the offense

charged herein"; "finding that law enforcement officers had
'. . . the ability to proceed with a DUI investigation'"; "rely-
ing on insufficient evidence to show probable cause to arrest
[Porter] for [DUI]"; "finding that statements elicited from
[Porter] by law enforcement officers were admissible"; and
"finding that a warrant to obtain a sample of [Porter's] blood
was not required." The statement of errors separately alleged
that the county court erred in its "receipt of an evidentiary
blood test result at trial, finding that the foundational require-
ments for the admission of the blood test result to have been
satisfied," and that the county court erred in "finding [Porter]
guilty beyond a reasonable doubt as to '. . . counts one and
two of the amended complaint' in the absence of evidence suf-
ficient to support such finding."

At the appeal hearing, the district court took judicial notice
of the county court transcript and bill of exceptions and
received written arguments from the parties. Thereafter, the
district court affirmed the county court's judgment and Porter's
convictions and sentences.

## III. ASSIGNMENTS OF ERROR

Porter assigns, restated, that the district court erred in (1)
affirming the county court's denial of his motion to suppress
and (2) affirming the county court's finding that the evidence
was sufficient to support his convictions.

## IV. STANDARD OF REVIEW

[1-5] In an appeal of a criminal case from the county court,
the district court acts as an intermediate court of appeals,
and its review is limited to an examination of the record for
error or abuse of discretion. *State v. McGinn*, 303 Neb. 224,
928 N.W.2d 391 (2019), *modified on denial of rehearing* 303
Neb. 931, 932 N.W.2d 83. Both the district court and a higher
appellate court generally review appeals from the county
court for error appearing on the record. *Id*. When reviewing
a judgment for errors appearing on the record, an appellate

court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* But we independently review questions of law in appeals from the county court. *Id.* When deciding appeals from criminal convictions in county court, we apply the same standards of review that we apply to decide appeals from criminal convictions in district court. *Id.*

[6] An appellate court applies a two-part analysis when reviewing whether a consent to search was voluntary. *State v. Saitta*, 306 Neb. 499, 945 N.W.2d 888 (2020). As to the historical facts or circumstances leading up to a consent to search, the appellate court reviews the trial court's findings for clear error. *Id.* However, whether those facts or circumstances constituted a voluntary consent to search, satisfying the Fourth Amendment, is a question of law, which the appellate court reviews independently of the trial court. *State v. Saitta, supra*. And where the facts are largely undisputed, the ultimate question is an issue of law. *Id.*

[7] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. McGinn, supra.*

[8] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id.* Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *Id*.

## V. ANALYSIS

### 1. Motion to Suppress

Porter first claims that the district court erred in affirming the county court's overruling of his motion to suppress. More specifically, Porter argues that his motion to suppress should have been granted because (a) no probable cause to arrest him existed because the PBT was administered improperly; (b) he was unlawfully arrested without a warrant in violation of § 29-404.02; (c) his statements to Officer McAlevy were the product of a custodial investigation without *Miranda* warnings so were unlawfully obtained in violation of the Fifth Amendment; and (d) Porter's warrantless blood draw at the hospital was unlawfully obtained in violation of the Fourth Amendment. We will address each of these arguments independently.

[9] In reviewing a trial court's ruling on a motion to suppress based on the Fourth Amendment, we will uphold its findings of fact unless they are clearly erroneous. *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011). But we review de novo the trial court's ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search. *Id*.

### (a) Administration of PBT and Probable Cause to Arrest

Porter argues that the district court erred in affirming the county court's denial of his motion to suppress because the PBT was administered improperly in that Officer McAlevy did not personally observe Porter for the full 15-minute observation period as required by Title 177 and the PBT device used by Officer McAlevy was not shown to be the same device calibrated by Officer Noel. He contends that, because the PBT was not administered properly, no probable cause to arrest him existed and the evidence obtained following that arrest, including but not limited to Porter's blood test, should be suppressed on that basis.

[10-14] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government. *State v. McCave, supra*. An arrest is a highly intrusive detention (seizure) of a person that must be justified by probable cause. *Id*. Probable cause to support a warrantless arrest exists only if the officer has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime. *Id*. Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances. *Id*. We determine whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances. *Id*.

Porter's argument is premised on the theory that officers needed the results of the PBT in order to establish probable cause to arrest him. But in *State v. Halligan*, 222 Neb. 866, 868, 387 N.W.2d 698, 700 (1986), the Nebraska Supreme Court addressed a similar factual pattern and held:

> We find that the sheriff had probable cause to believe that a misdemeanor had been committed based upon the following facts: defendant's breath smelled of alcohol, his eyes were bloodshot, and his speech was slurred. We further find that the sheriff had probable cause to believe that a warrantless arrest was justified under § 29-404.02(2)(c) because evidence would be destroyed without immediate action. The body would metabolize the alcohol and the evidence would be lost. The arrest of defendant without a warrant was valid under § 29-404.02(2)(c). See *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966).

And in *State v. Huff*, 282 Neb. 78, 106-07, 802 N.W.2d 77, 101 (2011), the Nebraska Supreme Court, in addressing whether law enforcement had sufficient probable cause to arrest a suspect for DUI, stated:

To begin with, if an officer has probable cause to arrest a suspect for DUI and reasonable grounds to believe that the suspect committed DUI, the officer may arrest the suspect and require a blood test notwithstanding the fact that a [PBT] was not administered. And both reasonable grounds and probable cause were established in this case. [The defendant] was observed to have bloodshot, glassy eyes and difficulty standing. Nearly everyone who had contact with [the defendant] that night reported a strong odor of alcohol coming from him. We have little difficulty in concluding that despite the lack of field sobriety tests or a [PBT], there was ample evidence establishing probable cause to arrest [the defendant] and reasonable grounds to demand a blood test.

See, also, *State v. Fischer*, 194 Neb. 578, 234 N.W.2d 205 (1975) (Nebraska Supreme Court found officer had probable cause to make arrest after detecting odor of alcohol emanating from vehicle's driver following collision).

Similarly, in the instant case, upon arriving at the scene of the accident, after speaking with witnesses and having contact with Porter, Officer McAlevy determined that Porter had been traveling the wrong way on a one-way street when Porter's vehicle collided with another vehicle. During Officer McAlevy's initial contact with Porter, he observed that Porter had bloodshot and watery eyes, seemed confused when speaking, was disoriented, and was slurring his speech. After Porter was checked by medical personnel on scene, Officer McAlevy again contacted Porter, this time also observing that Porter had the odor of alcohol emanating from his person, was swaying, and was struggling to maintain his balance. After reviewing the entirety of this record, even without considering the results of the PBT or Porter's admissions of consuming alcohol, we find that probable cause existed to arrest Porter for DUI.

### (b) Warrantless Arrest

Porter separately argues that pursuant to § 29-404.02, police lacked the authority to arrest him without a warrant because the alleged misdemeanor crime did not take place in the officer's presence.

Section 29-404.02 provides, in pertinent part:

> (1) Except as provided in sections 28-311.11 and 42-928, a peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed:
>
> . . .
>
> (b) A misdemeanor, and the officer has reasonable cause to believe that such person either (i) will not be apprehended unless immediately arrested, (ii) may cause injury to himself or herself or others or damage to property unless immediately arrested, (iii) may destroy or conceal evidence of the commission of such misdemeanor, or (iv) has committed a misdemeanor in the presence of the officer[.]

Porter acknowledges that although the Nebraska Supreme Court has previously held that the risk of dissipation of alcohol content in a person's body provided a sufficient basis for a warrantless arrest pursuant to § 29-404.02(1)(b)(iii), he argues that that holding was called into question by the U.S. Supreme Court's holding in *Missouri v. McNeely*, 569 U.S. 141, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), and that the Nebraska Supreme Court should revisit the issue. *McNeely* is factually different in that the Court examined the issue of requiring a warrant prior to drawing blood from an individual suspected of DUI as opposed to a warrantless arrest of that person. But whether *McNeely* has some bearing on Nebraska jurisprudence is a matter we need not decide.

Recently, in *State v. Hoehn*, 316 Neb. 634, 649, 6 N.W.3d 487, 497 (2024), the Nebraska Supreme Court clarified that when applying the dictates of the U.S. Supreme Court's

holding in *Virginia v. Moore*, 553 U.S. 164, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008), stating:

> the U.S. Supreme Court clarified that whether a search is reasonable under the Fourth Amendment "has never depend[ed] on the law of the particular State in which the search occurs." The Court accordingly held that where there was probable cause for the defendant's arrest for driving with a suspended license, the trial court properly denied the defendant's motion to suppress evidence found in the search pursuant to that arrest, even though the arresting officer lacked authority to make the arrest because driving with a suspended license was not an arrestable offense under state law.

Applying that rationale to the facts in *Hoehn*, which was centered on an alleged violation of a Nebraska jurisdictional statute that conferred no authority to arrest the defendant outside of the police officer's jurisdictional territory, the Nebraska Supreme Court held that

> regardless of [the officer's] jurisdictional power and authority under § 29-215 to have conducted the stop and arrest of [the defendant], since there is no dispute that the stop was supported by reasonable suspicion and the arrest was supported by probable cause, the exclusionary rule applicable to violations of the Fourth Amendment and article I, § 7, of the Nebraska Constitution does not apply to the fruits of the stop. These constitutional provisions were the sole basis for [the defendant's] objection to the evidence at trial. Accordingly, the county court did not err in denying [the defendant's] motion to suppress brought under the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution.

*State v. Hoehn*, 316 Neb. at 656, 6 N.W.3d at 501.

We make a similar finding here. Regardless of Porter's claim that the arresting officer lacked authority under § 29-404.02(1) to arrest Porter without a warrant, having found that there

was probable cause for his arrest, we reject Hoehn's claim that the district court erred in denying his motion to suppress evidence applying the exclusionary rule provided in the U.S. and Nebraska Constitutions for an alleged violation of this Nebraska statute.

### (c) Statements to Law Enforcement

Porter next contends that his statements to law enforcement should have been suppressed because he was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prior to making those statements. Specifically, he argues that during the 15-minute observation period prior to being administered the PBT, he was not free to leave and gave incriminating statements in response to Officer McAlevy's questioning without being advised of his *Miranda* rights.

[15-19] In *State v. Vaughn*, 314 Neb. 167, 182-83, 989 N.W.2d 378, 393 (2023), the Nebraska Supreme Court recently stated:

> *Miranda* prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. The safeguards provided by *Miranda* """come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."'" Under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement after a person has been taken into custody or is otherwise deprived of his or her freedom of action in any significant way. Both the U.S. Supreme Court and this court have emphasized that "the ultimate inquiry for determining whether a person is 'in custody' for purposes of *Miranda* '"is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."'" We view these two articulations as synonymous.

The term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

The court further stated:

Notably, in *Berkemer v. McCarty*, [468 U.S. 420, 436, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984),] the [U.S. Supreme] Court acknowledged that "few motorists would feel free . . . to leave the scene of a traffic stop without being told they might do so." Nonetheless, it rejected the suggestion that any roadside questioning of a person detained pursuant to a routine traffic stop constitutes custodial interrogation within the scope of *Miranda*. In so doing, the Court observed two features of traffic stops which mitigate the danger that the person questioned would be induced "'to speak where he would not otherwise do so freely.'"

First, detention pursuant to a traffic stop is "presumptively temporary and brief." Second, the circumstances of the typical traffic stop are not such that the person detained feels "completely at the mercy of the police"; the typical traffic stop is at least somewhat public, and the person detained typically confronts at most one or two officers. Accordingly, the Court reasoned that an ordinary traffic stop is "substantially less 'police dominated'" than the kinds of interrogation at issue in *Miranda*.

. . . .

Previously, in *State v. Rogers*, [277 Neb. 37, 57, 760 N.W.2d 35, 54 (2009),] we noted the "large body of case law . . . developed since *Miranda*" which has made apparent "certain circumstances that are most relevant to the custody inquiry." Those circumstances include: (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to

leave; (2) whether the contact with the police was initiated by them or by the person interrogated, and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used other interrogation techniques to pressure the suspect; and (8) whether the police manifested to the defendant a belief that the defendant was culpable and that they had the evidence to prove it.

*State v. Vaughn*, 314 Neb. 167, 183-86, 989 N.W.2d 378, 393-95 (2023). Contra *State v. Andersen*, 213 Neb. 695, 331 N.W.2d 507 (1983) (prior to decision in *Vaughn*, officer detaining defendant for PBT interrogated defendant whether he had been drinking violated *Miranda*). But see, *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010) (temporarily detaining driver to submit to routine field sobriety tests does not ordinarily rise to level of custody so as to implicate *Miranda*); *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996) (driver not in custody for purposes of *Miranda* at time of his verbal responses to field sobriety tests in officer's police cruiser).

Applying the *Vaughn* factors here, the record establishes that Officer McAlevy and Porter's interactions occurred on a public street; that Officer McAlevy initiated contact with Porter in the course of investigating an automobile accident; and that, during their interactions, Officer McAlevy never told Porter that he was free to leave. And although Officer McAlevy testified that Porter was not free to leave during the observation period, that fact is not determinative. See, *State*

*v. Vermuele*, 234 Neb. 973, 453 N.W.2d 441 (1990) (validity of arrest is based upon objective existence of probable cause, not officer's subjective belief or knowledge); *State v. Brown*, 13 Neb. App. 359, 693 N.W.2d 559 (2005) (fact that officer testified that defendant was not free to leave not determinative of whether defendant is in custody). The evidence further established that Porter was not handcuffed or otherwise restrained during the observation period and that Officer McAlevy was not aggressive or confrontational during the exchange and did not articulate that he believed Porter was guilty and had the evidence to prove it. The evidence further established that there were no restrictions on Porter's freedom of movement and that neutral parties (others involved in the accident) were present.

On this record, we find that the district court did not err in affirming the county court's determination that Porter was not in custody at the point during the 15-minute observation period during which Porter made representations concerning the number of alcoholic drinks he had consumed.

### (d) Results of Warrantless Blood Draw

Porter finally argues that the results of the warrantless blood draw should have been suppressed because his consent was not voluntary.

[20-23] It has long been recognized that the drawing of blood from a person's body for the purpose of administering blood tests is a search of the person subject to Fourth Amendment constraints. *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022). Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Miller, supra*. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Id*. The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances,

(3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *Id*. It is the State's burden to show that a search falls within an exception to the warrant requirement. *Id*.

Here, the State relies on the consent exception to justify the reasonableness of the warrantless blood draw. Porter argues that, although he checked a box on a consent form which purported to acknowledge his consent to a blood draw, his consent was not obtained voluntarily because the postarrest chemical advisement form did not satisfactorily advise him of his constitutional right to refuse to submit and the form did not include any language indicating he understood he had a right to refuse and was giving up that right freely and voluntarily. Porter further argues that there were "'inherent contradictions'" between the postarrest chemical advisement form read to him and the language contained in Nebraska's implied consent statutes. Brief for appellant at 42.

[24-28] Generally, to be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne. *State v. Degarmo*, 305 Neb. 680, 942 N.W.2d 217 (2020). Consent for a warrantless search must be given voluntarily and not as a result of duress or coercion, whether express, implied, physical, or psychological. *Id.* The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law. *Id*. Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent. *Id.* While there is no requirement that police must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search, knowledge of the right to refuse is a factor to be considered in the voluntariness analysis. *Id*.

The postarrest chemical advisement form signed by Porter provided:

You are under arrest for operating or being in actual physical control of a motor vehicle while under the influence of alcoholic liquor or drugs.

. . . Pursuant to law, I am asking you to submit to a chemical test or tests of your BLOOD to determine the concentration of alcohol in your body. You do not have to submit to such test or tests, but if you refuse, we may seek a warrant requiring such test or tests.

Under the advisement was a space to initial either "I consent a test of my blood" or "I refuse to submit to test of my blood." Porter initialed next to the consent line and signed his name at the bottom.

Additionally, the implied consent statute, Neb. Rev. Stat. § 60-6,197 (Reissue 2021), provides:

(1) Any person who operates or has in his or her actual physical control a motor vehicle in this state shall be deemed to have given his or her consent to submit to a chemical test or tests of his or her blood, breath, or urine for the purpose of determining the concentration of alcohol or the presence of drugs in such blood, breath, or urine.

. . . .

(4) Any person involved in a motor vehicle accident in this state may be required to submit to a chemical test or tests of his or her blood, breath, or urine by any peace officer if the officer has reasonable grounds to believe that the person was driving or was in actual physical control of a motor vehicle on a public highway in this state while under the influence of alcoholic liquor or drugs at the time of the accident.

[29] And, in *State v. Modlin*, 291 Neb. 660, 867 N.W.2d 609 (2015), the Nebraska Supreme Court stated that the implied consent statute is just one circumstance to be considered in the totality of the circumstances in determining if the consent to a blood test was voluntary. The court stated:

At this juncture, it is important to distinguish between "implied consent" and "actual consent." The Court of Appeals of Wisconsin stated: "'Implied consent' is not an intuitive or plainly descriptive term with respect to how the implied consent law works. [It may be] a source of confusion. [T]he term 'implied consent' [may be] used inappropriately to refer to the consent a driver gives to a blood draw at the time a law enforcement officer requires that driver to decide whether to give consent. However, actual consent to a blood draw is not 'implied consent' . . . ." *State v. Padley*, 354 Wis. 2d 545, 564, 849 N.W.2d 867, 876 (Wis. App. 2014). In connection with actual consent, the *Padley* court continued: "[T]he implied consent law is explicitly designed to allow the driver, and not the police officer, to make the choice as to whether the driver will give or decline to give *actual* consent to a blood draw when put to the choice between consent or automatic sanctions [for refusal]." 354 Wis. 2d at 571, 849 N.W.2d at 879 (emphasis in original). That is, ordinarily, the point at which the driver chooses not to refuse is the point in time at which the driver actually consents to a blood draw. And the Supreme Court of Georgia in *Williams v. State*[, 296 Ga. 817, 771 S.E.2d 373 (2015)], noted that the determination of actual consent to the procuring and testing of a driver's blood requires the determination of the voluntariness of the consent under the totality of the circumstances. . . . See, also, *People v. Harris*, 234 Cal. App. 4th 671, 184 Cal. Rptr. 3d 198 (2015); *State v. Brooks*, 838 N.W.2d 563 (Minn. 2013).

*State v. Modlin*, 291 Neb. at 672, 867 N.W.2d at 618.

In viewing the totality of the circumstances, including that Porter had given his implied consent under § 60-6,197 and that he affirmed that consent after he initialed and signed the chemical test advisement form which provided the consequences if Porter refused to consent, we conclude, as did both

the county and the district courts, that Porter was aware of his rights and voluntarily consented to the blood draw.

## 2. Sufficiency of Evidence

Porter's final assignment of error is that the district court erred in affirming his convictions because the evidence was insufficient to support a finding of guilt beyond a reasonable doubt.

### (a) Traveling Wrong Way on One-Way Roadway

Regarding Porter's conviction for traveling the wrong way on a one-way roadway, § 60-6,138 provides, in pertinent part:

> (1) The Department of Transportation and local authorities with respect to highways under their respective jurisdictions may designate any highway, roadway, part of a roadway, or specific lanes upon which vehicular traffic shall proceed in one direction at all times or at such times as shall be indicated by traffic control devices.

> (2) Except for emergency vehicles, no vehicle shall be operated, backed, pushed, or otherwise caused to move in a direction which is opposite to the direction designated by competent authority on any deceleration lane, acceleration lane, access ramp, shoulder, or roadway.

Here, the evidence at trial established that Officer McAlevy responded to a report of a motor vehicle accident occurring on a one-way street. After speaking with witnesses, Officer McAlevy determined that Porter had been traveling the wrong way on a one-way street when he collided with the other driver. This evidence is sufficient to support Porter's conviction of traveling the wrong way on a one-way roadway.

### (b) DUI

Porter also contends that there was insufficient evidence to support his conviction of DUI under of § 60-6,196. Contained within this assignment of error, Porter contends that his blood draw results should not have been admitted, because the State

failed to adduce sufficient foundational testimony to establish that the hospital which drew and tested his blood had policies and procedures that conformed with the relevant regulations under Title 177.

### (i) Foundational Requirements for
### Admission of Blood Test Results

Porter acknowledges that the "'relevant regulations'" governing the proper policy and procedures for testing blood are set forth in Title 177, but he contends that the State failed to establish that the hospital's policies and procedures for testing Porter's blood complied with Title 177 or that Meier was familiar with Title 177 as amended in 2016. As it relates to those regulations, he argues that foundation for admission of his blood test results was lacking because the State failed to offer evidence concerning the hospital laboratory's compliance with §§ 006.05 and 006.06 of Title 177. Specifically, he contends that the State failed to adduce evidence (1) that the quality control sample result was greater than "+/- three standard deviations" in order for the test results to be reported as required by § 006.05B2; (2) that the hospital complied with the requirement that "[o]n or before July 1 of each even-numbered year, Class A permit holders must submit his/her reports of standard deviation data for the previous 24 month period to the Department" as required by § 006.05C; (3) that the hospital conformed with ongoing performance evaluation studies as required by § 006.05D; (4) that the hospital complied with maintaining record requirements, including, but not limited to, quality control results and related data as required by § 006.05E. He separately argues that the State failed to demonstrate compliance with "Inspection, Maintenance, and Repair of Laboratory Instruments for Class A Methods" as set forth in § 006.06.

In Nebraska, chemical blood tests are governed by Neb. Rev. Stat. § 60-6,201 (Reissue 2021), which provides in relevant part:

(1) Any test made under section 60-6,197, if made in conformity with the requirements of this section, shall be competent evidence in any prosecution under a state statute or city or village ordinance involving operating a motor vehicle while under the influence of alcoholic liquor or drugs or involving driving or being in actual physical control of a motor vehicle when the concentration of alcohol in the blood or breath is in excess of allowable levels.

. . . .

(3) To be considered valid, tests of blood, breath, or urine made under section 60-6,197 or tests of blood or breath made under section 60-6,211.02 shall be performed according to methods approved by the Department of Health and Human Services and by an individual possessing a valid permit issued by such department for such purpose, except that a physician, registered nurse, or other trained person employed by a licensed health care facility or health care service which is defined in the Health Care Facility Licensure Act or clinical laboratory certified pursuant to the federal Clinical Laboratories Improvement Act of 1967, as such act existed on September 1, 2001, or Title XVIII or XIX of the federal Social Security Act, as such act existed on September 1, 2001, to withdraw human blood for scientific or medical purposes, acting at the request of a peace officer, may withdraw blood for the purpose of a test to determine the alcohol concentration or the presence of drugs and no permit from the department shall be required for such person to withdraw blood pursuant to such an order. The department may approve satisfactory techniques or methods to perform such tests and may ascertain the qualifications and competence of individuals to perform such tests and issue permits which shall be subject to termination or revocation at the discretion of the department.

In *State v. Alkazahy*, 314 Neb. 406, 412-13, 990 N.W.2d 740, 745 (2023), the Nebraska Supreme Court recently stated:

To be considered valid, tests of blood, breath, or urine made under Neb. Rev. Stat. § 60-6,197 (Reissue 2021) or tests of blood or breath made under Neb. Rev. Stat. § 60-6,211.02 (Reissue 2021) shall be performed according to methods approved by DHHS. [See § 60-6,201(3).] DHHS may approve satisfactory techniques or methods to perform such tests. The parties agree that chapter 1 of title 177 hosts the governing DHHS regulations in this case.

Under title 177, a method is defined as "the name of the principle of analysis" and "may be a laboratory method." A laboratory method is a chemical analysis using laboratory procedures and instrumentation. The failure to perform a test using the prescribed *methods* makes the test result inadmissible. A technique is defined as a "set of written instructions which describe the procedure, equipment, and equipment prevent[at]ive maintenance necessary to obtain an accurate alcohol content test result." Any deficiencies in techniques used to test the breath or blood alcohol level in DUI cases generally are of no foundational consequence, but only affect the weight and credibility of the testimony.

According to Title 177, a method is "the name of the principle of analysis. The method may be a laboratory method." § 001.16. A laboratory method is defined under Title 177 as "a chemical analysis using laboratory procedures and instrumentation." § 001.14.

In order to be valid, Porter's blood test was required to be performed with methods approved by the Department of Health and Human Services (DHHS). Title 177 lays out the approved methods for Class A permit holders and lists the approved method on the Class A Permit. Accordingly, admissibility of Porter's blood test at trial required the State to present evidence that Porter's blood test was performed with

methods approved by DHHS. We find that the State complied with this requirement. During the trial, Meier testified she had been a medical laboratory scientist since 2006 and held a Class A permit for the State of Nebraska for testing blood samples. Her Class A permit, which was received into evidence, provided that Meier's approved method of testing was gas chromatography, which is an authorized method specifically listed in Title 177 for Class A permit holders. Meier further testified that the hospital in Grand Island where Porter's blood test was administered is licensed and regulated by the "Clinical Laboratory Improvement Amendment," a third-party organization that reviews laboratory testing, as well as hospital operations, and that the hospital is licensed to operate and function as a laboratory in Nebraska. This testimony was sufficient to establish foundation that Porter's blood test was performed pursuant to the gas chromatography method, which is approved by DHHS under Title 177. Notwithstanding this testimony, Porter argues that Meier failed to provide testimony regarding the hospital's compliance with the regulatory requirements of portions of §§ 006.5 and 006.6 of Title 177 and that those sections' dictates should be likewise considered "methods" and required foundational testimony of compliance to render the blood test results inadmissible. We disagree.

First, we disagree that Meier failed to provide testimony regarding procedure, technique, or the required expertise associated with the testing of Porter's blood. In that regard, Meier testified that she has been a medical laboratory scientist since 2006; that she has a Class A permit for testing blood samples; that the hospital where Porter's blood was tested is properly licensed and regulated; that the hospital has policies and procedures for performing legal blood testing that were authored by Meier and that have been renewed since implemented; and that she conducted the testing herself, using the gas chromatography analyzer which she is authorized to operate using her Class A permit and which is an approved instrument under Title 177. Further, Meier testified to the process for using

the gas chromatography method and that she followed the proper process in testing Porter's blood. Although Meier did not provide testimony as to the more specific requirements of §§ 006.5 and 006.6 of Title 177 as argued by Porter, we find that, on this record, Meier provided sufficient foundation for the method utilized to test Porter's blood and that the specific regulations cited by Porter, which he argues required more specific foundational testimony fall under the category described by the Nebraska Supreme Court as "of no foundational consequence, but only affect the weight and credibility of the testimony." *State v. Prescott*, 280 Neb. 96, 106, 784 N.W.2d 873, 883 (2010). If Porter believed that Meier failed to comply with the regulatory requirements set forth in §§ 006.05 and 006.06 of Title 177, he could have further pursued separate questions of this nature on cross-examination. But as it relates to Porter's specific assignment of error, we find that the district court did not err in admitting the results of Porter's blood tests into evidence over Porter's foundational objection to its admission.

Having determined that the results from Porter's blood test were properly admitted, we next address whether the evidence was sufficient to support Porter's conviction for DUI.

### (ii) Sufficiency of Evidence—DUI

Section 60-6,196 provides:

(1) It shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle:

(a) While under the influence of alcoholic liquor or of any drug;

(b) When such person has a concentration of eight-hundredths of one gram or more by weight of alcohol per one hundred milliliters of his or her blood; or

(c) When such person has a concentration of eight-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his or her breath.

(2) Any person who operates or is in the actual physical control of any motor vehicle while in a condition

described in subsection (1) of this section shall be guilty of a crime and upon conviction punished as provided in sections 60-6,197.02 to 60-6,197.08.

Here, Officer McAlevy was investigating a two-vehicle accident in which Porter admitted to being one of the drivers. During the investigation, he observed that Porter had bloodshot and watery eyes, he appeared disoriented and confused, and his speech was slurred. After Porter was released from medical personnel on scene, Officer McAlevy reinitiated contact with Porter, this time observing that he had the odor of alcohol emanating from his person, he was swaying, and he was having trouble maintaining his balance. Based upon these factors, Officer McAlevy decided to administer a PBT to Porter. When Officer McAlevy began a required 15-minute observation period in preparation for conducting a PBT, Officer McAlevy asked Porter if he had consumed any alcohol and Porter admitted to having two alcoholic drinks of "Crown and water." After administering the PBT, Officer McAlevy determined that Porter had failed the PBT with a .216 result. Officer McAlevy arrested Porter and transported him to the hospital where Porter consented to a blood draw, the results of which we have determined were properly admitted into evidence. The blood draw results showed that Porter's blood alcohol content was .226 grams per 100 milliliters of his blood. Based upon this record, the evidence was sufficient to support Porter's conviction for DUI. This assignment of error fails.

## VI. CONCLUSION

For the reasons stated above, we affirm Porter's convictions and sentences.

Affirmed.